*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 24-CF-1015

MARVIN W. LOPEZ, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2016-CF1-018780)

(Michael K. O'Keefe, *Judge*)

(Submitted March 17, 2026          Decided July 30, 2026)

*Peter H. Meyers* was on the briefs for appellant.

*David P. Saybolt*, Assistant United States Attorney, with whom *Jeanine Ferris Pirro*, United States Attorney, and *Chrisellen R. Kolb*, *Kristian L. Hinson*, and *Sarah Prins*, Assistant United States Attorneys, were on the brief for appellee.

Before EASTERLY, DEAHL, and SHANKER, *Associate Judges*.

DEAHL, *Associate Judge*: Marvin Lopez was charged with killing Evelyn Yamileth Arrollo Guerra, his girlfriend who had recently broken up with him, on Christmas Eve of 2014. He was convicted of first-degree murder and a related

firearm offense, and he now raises one challenge to his underlying convictions and two challenges to his sentence.

Lopez's challenge to his convictions relates to testimony from the government's expert on intimate partner violence. Defense counsel objected to the expert's proposed testimony in its entirety, but the government argued that its expert would offer testimony that was relevant (1) to helping the jurors understand why Arrollo would stay with Lopez, who was an allegedly abusive partner during their relationship, and (2) to further explain "why a relationship may become more lethal" when the victim "successfully ends the relationship with the abuser." The trial court permitted the expert to testify on the first topic but not the second.

Despite the court's ruling, the government's expert made two stray comments that violated the court's restrictions on her testimony. The more salient comment was that the expert briefly alluded to a study that concluded abuse is most likely to turn deadly either just before or just after a breakup, which mapped onto the government's allegations in this case that Lopez killed Arrollo shortly after their breakup. Defense counsel objected to that testimony and successfully moved to strike it from the record, but Lopez contends on appeal that was an insufficient remedy. He now argues that this testimony was so prejudicial that the trial court had no choice but to sua sponte declare a mistrial. We disagree for two reasons: (1) our

review of this unpreserved claim is for plain error, and when the government introduces improper testimony that unduly prejudices a defendant, we doubt it is ever plain error to not declare a mistrial that the defense has not requested; and (2) in any event, the improper testimony here, while quite prejudicial, was not so prejudicial that a mistrial was plainly the only acceptable remedy, even had the defense requested it.

Lopez also raises two challenges to the court's imposition of a fifty-year prison sentence. First, he argues that the trial court erred in denying him sentencing credit for time he spent incarcerated in El Salvador while awaiting extradition. This argument, which Lopez raised below, hinges on facts that we have no findings on, so we remand the case for the trial court to reconsider its sentence after making the relevant and necessary findings. Second, he argues that his sentence may have exceeded the maximum sentence permitted by "the extradition order from the Supreme Court of El Salvador," directing Lopez's return to the United States to stand trial. He has not fleshed that argument out enough to have any viable claim for relief, as he cannot point us to any term in that extradition order that his sentence violates.

## I. Background

Arrollo and Lopez started dating in 2012. That romantic relationship lasted for a couple of years, though it was marked by turmoil and violence, and their

frequent fights led to police intervention on several occasions. Gricelda Rivera lived with the couple and witnessed some of their fights. She explained that Lopez would sometimes threaten to kill Arrollo and say, "[I]f she wasn't going to be for him, then she wasn't going to be for anybody."

After a tumultuous two-year relationship, Arrollo left Lopez at some point around the beginning of December 2014. The record is not entirely clear about when precisely they broke up, perhaps because—as these things sometimes go—the breakup did not occur in one neat and tidy moment. But Arrollo moved out of their shared apartment and in with a new boyfriend, Juan Campos, early in December 2014. Just before Arrollo moved out, Lopez told her that he had a gun and threatened to kill her if she left him for somebody else. In the days after Arrollo moved in with him, Campos overheard phone calls where Lopez threatened to kill Arrollo. Lopez then posted a photo to Facebook on December 17—just a week ahead of the murder—depicting more than two dozen rounds of ammunition arranged to spell "Te Amo," or I love you. Two boxes of ammunition were underneath that message, with a hand-scrawled note: "Pero Si Me Fallas Todas Son Para Ti," which translates to "But if you fail me, all of them are for you."[1]

---

[1] Many of the messages in this case were in Spanish and translated into English for trial. From here on, we will stick to the various messages' English translations throughout this opinion.

The day after posting that to Facebook, Lopez sent Arrollo a direct message: "Never in my life will I forgive you for this betrayal," and he followed up with, "Now you'll know who I really am. You already know that you're my life and you're in that dog's house. But I'll find you both ok." Lopez then continued with a string of threatening direct messages, saying, "Where it started it will end," in an apparent reference to Sabor Latino, where he first met Arrollo; "You're going to die. I swear it."; "Remember this, I'm going to shoot you 4 times." A few days later, now just three days before Arrollo would be shot and killed, Lopez messaged Arrollo that he was "over all the pain that [he] was feeling" and invited her to come back to the apartment to retrieve her belongings, but she refused.

On December 24, 2014, Campos drove Arrollo to Sabor Latino, where she worked as a waitress, for her 5 p.m. shift. Lopez's roommate testified that he abruptly left their shared apartment at around that same time. After Campos dropped Arrollo off, and as Campos was driving away, he saw Lopez walking across 14th Street toward the restaurant. Campos tried to send Arrollo a message warning her that Lopez was in the area, but could not get a hold of her, and he did not see what happened next. An eyewitness inside Sabor Latino recognized a man he had seen with Arrollo "a few times" crossing 14th Street toward the restaurant. The witness saw the man grab Arrollo as she struggled to open the door to the restaurant. The witness and a nearby manager went to the door to let Arrollo in, but by the time they

got there she had fallen back and lost consciousness, and there was "a lot of blood on the ground." Two police officers who were about a block away heard the gunshots and responded to the scene. One officer stayed with Arrollo and the other chased the fleeing shooter down a side street, but the shooter got away.

After the shooting, Campos showed the police Lopez's Facebook post with the message written in rounds of ammunition. The police quickly zeroed in on Lopez as the prime suspect, but they were unable to locate him. The government nonetheless indicted Lopez in 2016, charging him with first-degree murder while armed and possession of a firearm during a crime of violence. Lopez was eventually arrested in El Salvador in 2020 or 2021, and El Salvador extradited him to the United States in 2023 to stand trial. A jury found Lopez guilty of both counts based largely on the evidence recounted above, though we will add some further details about admitted expert testimony below.

Before sentencing, Lopez raised two claims that are relevant here. First, he argued that he should be given credit for the two-plus years he was incarcerated while awaiting extradition from El Salvador. Second, he argued that the extradition order directing Lopez's return to the United States might have placed some unknown cap on his maximum sentence. Defense counsel had the relevant order in hand, but he represented that it had not yet been translated and further indicated that he would

file a motion if the extradition agreement conflicted with the court's ultimate sentence.

The judge then sentenced Lopez to fifty years' imprisonment. The judge gave Lopez "credit for time served in the United States" but indicated (without stating any reasons) that Lopez would not get any "credit for any time in El Salvador." Defense counsel objected that Lopez should be given credit for the entirety of his pre-trial detention abroad, and without substantive refute, the court responded with "[i]f that is an illegal sentence, let me know." The judgment and commitment order that followed expressly gave Lopez "credit for time served in the United States." As for Lopez's second sentencing challenge, the judge indicated that he did not "know what kind of agreement was worked out between the United States and El Salvador" because "[n]obody's filed anything" about that.

Lopez now appeals.

## II. Analysis

We first address Lopez's lone challenge to the guilt phase of his trial, concerning the government expert's testimony, and then we address his two sentencing challenges.

*A. The trial court did not plainly err in failing to sua sponte declare a mistrial*

Lopez argues that the government's domestic violence expert, Dr. Chitra Raghavan, made two statements that were so prejudicial to his case that the trial court was required to declare a mistrial sua sponte. Because the trial court failed to take that required action, Lopez argues that we must now reverse his convictions. Before we address the merits of that claim, we first detail Raghavan's testimony.

Before trial, the government notified Lopez of its intent to introduce the testimony of Raghavan as an expert in "traumatic bonding and coercive control in the context of domestic violence." The government argued that Raghavan's testimony would help explain "paradoxical, incongruous behavior by the victim [of an abuser] that is often hard for a lay person, like a juror, to understand." Raghavan also proposed to explain how and "why a relationship may become more lethal" when the victim "successfully ends the relationship with the abuser." Lopez moved to exclude this testimony on several grounds, including that it appeared to be rank propensity evidence. That is, it appeared to invite jurors to infer from Lopez's past bad acts (domestic violence) that he had committed the charged murder. The trial court agreed with defense counsel, in part, and permitted the expert to testify, but not as to "the factors and circumstances which increase the likelihood an abuser will kill or attempt to kill a victim."

Raghavan nonetheless exceeded the court-ordered limitations on her testimony on two occasions. First, she responded to one of the government's questions by indicating that the age difference between partners in a relationship bore some relationship to the likelihood that the relationship would become deadly. She began to explain what that relationship was, but she managed to get out only "[W]hat it does . . ." before defense counsel objected. The government correctly noted that Raghavan's answer was not responsive to the question, and the court sustained defense counsel's objection. Defense counsel then indicated that he did not want the court to "strik[e] anything" because he did not want "to call any attention" to the improper but nascent testimony.

Second, and not long thereafter, Raghavan testified in a manner that far more egregiously violated the limitations on her testimony. She was discussing a "myth" that domestic violence ends when the relationship ends, and she explained that "[i]n some relationships the coercion increases about a month before she leaves until about a year after she leaves." She then described a recent study in which "most of the women . . . were murdered within a month to six months of leaving their abusers." Defense counsel objected and asked the court to strike the comment "with an admonishment." The trial court sustained the objection and told the jury "to strike and not give any weight" to "the statement . . . that women were murdered within

one month to six months after leaving their abuser." Defense counsel sought no further remedy.

Lopez now argues that the above statements were so prejudicial that the trial court erred in failing to sua sponte declare a mistrial that defense counsel never requested. The government is correct that this claim was unpreserved, so that we review it only for plain error: "When an appellant argues for a mistrial after having failed to seek one in the trial court, we review the record only for plain error." *McGriff v. United States*, 705 A.2d 282, 288 (D.C. 1997); *see also Lucas v. United States*, 20 A.3d 737, 744 (D.C. 2011) (similar); *Lewis v. United States*, 930 A.2d 1003, 1008 (D.C. 2007) (similar).[2] We discern no plain error for two principal reasons.

First, when the government or one of its witnesses improperly injects prejudicial testimony into the trial, we doubt it is ever plain error for the court not to sua sponte declare a mistrial that the defendant has not requested. That is because it is generally improper, under those circumstances, for the court to grant a mistrial

---

[2] To prove plain error, an appellant must demonstrate (1) error, (2) that such error is "'plain,' meaning 'clear' or 'obvious,' by the time of appellate review"; (3) that the error affected their "substantial rights"; and (4) that the error "seriously affected 'the fairness, integrity or public reputation of [the] judicial proceedings.'" *Chew v. United States*, 314 A.3d 80, 83 n.1 (D.C. 2024) (quoting *In re Taylor*, 73 A.3d 85, 96 (D.C. 2013)).

that the defendant does not want, and there are many good reasons why a defendant may wish to see his trial through to its end, even with the injection of some improper prejudice, rather than starting anew. *See Walker v. United States*, 317 A.3d 388, 408 (D.C. 2024) ("To simply start things over from scratch would be a sizable boon for the government."). "When mid-trial 'prosecutorial error' like the one here prejudices a defendant, our precedents show an unflinching commitment to the principle that the defendant must 'retain primary control over the course to be followed.'" *Id.* at 392 (quoting *Oregon v. Kennedy*, 456 U.S. 667, 676 (1982)). And because Lopez has not shown that he plainly would have acquiesced to a mistrial, despite defense counsel's failure to request one, his argument does not even get off the ground.

Second, even if we put that fatal flaw in his argument aside and assume for the sake of argument that Lopez would have acquiesced to a mistrial, this testimony was not so prejudicial that a mistrial was plainly the only proper remedy. The first piece of Raghavan's testimony said virtually nothing—she hinted that age discrepancies between partners had some relationship to the likelihood that abuse would turn deadly, but she never said or implied anything about what that relationship was. And while it appears that Lopez was about eight years older than Arrollo, that age difference was not highlighted in the testimony. It is also not clear or obvious to us that jurors would have presupposed anything about what Raghavan

would have had to say, had she not been cut off, about how such modest age differences might bear on a relationship turning deadly.

Lopez's next challenge to Raghavan's testimony has far more merit to it. Raghavan's testimony that "most of the women" in one study "were murdered within a month to six months of leaving their abusers" was far more prejudicial, as it mapped onto the facts of this case. That testimony clearly invited the jury to draw an impermissible propensity inference—that because abusers tend to kill their partners shortly after their relationship ends, and because Lopez was abusive in their relationship which had previously ended, it stood to reason that he killed her. *See In re Richardson*, 273 A.3d 342, 350 (D.C. 2022) ("It is fundamental that evidence of prior bad acts independent of the crimes charged is inadmissible to show the defendant's disposition or propensity to commit the charged offenses." (quoting *Harrison v. United States*, 30 A.3d 169, 176 (D.C. 2011))); *see also* Fed. R. Evid. 404(b)(1). But as prejudicial as this testimony was, it is neither clear nor obvious that a mistrial was the only potentially effective remedy. "Our caselaw abounds with similar cases where curative instructions were found to have sufficiently mitigated extremely damning evidence introduced against a defendant." *Walker*, 317 A.3d at 412 & n.17 (collecting cases). Plus, the fact that Lopez did not ask for a mistrial and instead asked only that the testimony be stricken is itself strong evidence that a mistrial was not required here. *See Hunter v. United States*, 606 A.2d 139, 145 (D.C.

1992) ("The lack of any reaction from defense counsel might have suggested that she did not perceive any prejudice, a fact which is itself suggestive in some measure of lack of prejudice."). In our view, the trial court "could thus reasonably [have] conclude[d], in the absence of a defense objection, that the situation was not extreme enough to warrant [an] uninvited" mistrial. *See id.* at 146.

Finally, we note the government's case against Lopez was incredibly strong relative to the prejudicial impact of Raghavan's improper comments. *See Young v. United States*, 305 A.3d 402, 418 (D.C. 2023) (considering "the relative strength of the government's case" when assessing the necessity for a mistrial (quoting *Trotter v. United States*, 121 A.3d 40, 53 (D.C. 2015))). The government presented testimony from several eyewitnesses to the shooting, including one (Campos) who positively identified Lopez walking toward Arrollo just before she was killed, and it introduced messages from Lopez threatening to kill Arrollo multiple times in the days before she was killed. And then there is the further incriminating fact that Lopez promptly fled the country after Arrollo was killed. In light of the government's very strong case, Raghavan's challenged comments, prejudicial though they may have been, stood little chance of having swayed the jury to convict if the remainder of the evidence had not already done the trick. On this record, we conclude the trial court did not plainly err by failing to sua sponte declare a mistrial, so we affirm Lopez's convictions.

*B. Sentencing issues*

Lopez next raises two sentencing challenges. First, he argues that the trial court erred when, without explanation, it denied him credit for time served while awaiting extradition in El Salvador. Second, he argues that a remand is required "to allow argument on whether the extradition order from the Supreme Court of El Salvador prohibited [the trial judge] from imposing the fifty-year sentence."

As to Lopez's first claim, we remand for resentencing. The trial court never explained why it denied Lopez credit for time he spent incarcerated in El Salvador, and he raised a potent argument that he was entitled to credit for that time served. *See* D.C. Code § 24-221.03(a) ("Every person shall be given credit on the maximum and the minimum term of imprisonment for time spent in custody . . . as a result of the offense for which the sentence was imposed."). The government now seems to agree with Lopez that he was entitled to credit for that time served, at least insofar as he was being held in El Salvador "solely" on account of his pending extradition (as opposed to serving time on some other charge). The government nonetheless argues that we should not review this claim because Lopez did not provide "documentation to support his claim" before the trial court, so that his only remedies now would be to petition the Bureau of Prisons, or BOP, or to seek a writ of habeas corpus.

We disagree with the government. The trial court did not suggest that Lopez's claim lacked sufficient documentation—if it had, Lopez might have readily supplied it. The court instead rejected this claim for untold reasons that it should explain or reconsider on remand. When the record is "not clear" about a material disputed fact "which was not squarely presented to or relied upon by the trial court" in a sentencing credit decision, and the parties do not otherwise dispute the applicable law, we may remand to the sentencing court to clarify any findings. *See Ali v. District of Columbia*, 612 A.2d 228, 230 (D.C. 1992). And contrary to the government's argument, Lopez would not seem to have any effective remedy within BOP because the trial judge here expressly declined to give Lopez credit for the time he spent incarcerated in El Salvador, and BOP has no authority to second guess that judicial judgment call. It is the court's province to impose and announce the sentence to be served, and the BOP is left to execute and administer that sentence—it is not free to rewrite it. *See generally Alston v. United States*, 590 A.2d 511, 514 (D.C. 1991) (explaining that "imposition of [the] sentence" is left to the trial court, whereas "execution of [the] sentence" is left to the "executive department," typically BOP); *Francis v. United States*, 715 A.2d 894, 898 n.9 (D.C. 1998) (explaining that the "judiciary . . . pronounce[s the] sentence," and "the executive . . . administers it"). While a petition for a writ of habeas corpus might present an alternative route for

relief, *see Alston*, 590 A.2d at 514, the availability of that route does not obviate Lopez's right to a reasoned decision from the sentencing court itself.

As to Lopez's second claim, we discern no grounds for a remand because Lopez has not made so much as a bare representation that his sentence violates any term of the extradition order. Lopez and his counsel are in possession of that extradition order, and have all the tools necessary to translate it, evaluate what it says, and make some representation or argument about how the fifty-year sentence imposed here violates it. And yet, neither before the trial court nor before this court has Lopez actually been able to point to any term in the extradition order that his sentence violates. We are not in the habit of remanding cases for parties to consider fleshing out claims that they have to date been unable to articulate, as that would be an extraordinary waste of finite court resources. We do not foreclose the possibility that Lopez might be entitled to some collateral relief on this claim if he comes forward with persuasive evidence that his sentence does in fact violate the terms of his extradition. But on this record, where Lopez seems to have all the tools at his disposal to flesh out any argument that his sentence violates the extradition order and yet has never actually articulated a concrete argument to that effect, we see no basis to direct the trial court to consider his claim.

## III. Conclusion

For the foregoing reasons, we affirm Lopez's convictions and remand the case to the trial court to reconsider, or to further explain, its decision declining to give Lopez credit for the time he spent incarcerated while awaiting extradition.

*So ordered.*